UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| REC SOFTWARE USA, INC., | CASE NO. C11-0554JLR |
| Plaintiff, | ORDER ON |
| v. | CLAIM CONSTRUCTION |
| BAMBOO SOLUTIONS CORPORATION, et al., | |
| Defendants. | |

## I.      INTRODUCTION

This is an order on claim construction in a patent infringement action involving a single patent related to what the patent names a "code server," which maintains and provides information for linking computer code modules that together constitute a computer program.  Plaintiff REC Software USA, Inc. ("REC") sued Defendants Bamboo Solutions Corporation, Microsoft Corporation, SAP America Inc., and SAP AG (collectively, "Defendants") for infringement of claims 1 and 8 of United States Patent

No. 5,854,936 ("the '936 Patent") (the "Patent-in-Suit").[1]  The court has considered the

parties' briefing and supporting materials and has heard both oral argument from the

parties and expert testimony at a *Markman* hearing, held on January 13, 2011.  This order

memorializes the court's construction of the disputed language in the Patent-in-Suit.

## II.   BACKGROUND

### A.   Introduction

Stephen F.B. Pickett is the sole inventor of the Patent-in-Suit, which was assigned

to REC.  (*See* U.S. Patent No. 5,854,936 ('936 Patent).)  REC contends that Microsoft

Corporation's ("Microsoft") operating systems that are supported by, or support or

utilize, the .NET Framework—namely, Windows 2000, Windows Server 2003, Windows

Server 2008, Windows Vista, Windows XP, and Windows 7—infringe the above-stated

claims of the Patent-in-Suit.  (Joint Claim Construction Statement (Dkt. # 112) at 1-2.)

Additionally, REC contends that SAP America, Inc. and SAP AG's (collectively, "SAP")

"NetWeaver" products infringe the above-stated claims of the Patent-in-Suit.  (*Id.* at 2.)

### B.   Factual Background

The Patent-in-Suit disclose systems and methods related to the behind-the-scenes

work done by a computer's operating system to prepare complex computer programs for

execution by a "user" computer.  ('936 Patent at 1:6-10; Defendants Opening Br. (Dkt. #

119) at 5.)  The central component of the invention is a "code server," which operates in

a multi-module computer operating system to efficiently identify and facilitate the

---

[1] In its complaint, REC asserted claims 1-6, 8-10, 13, 15, 17, 18, and 22 of the '936 Patent, but by stipulation now only asserts claims 1 and 8.  (Stip. (Dkt. # 150).)

1  provision of modules of computer code that constitute a computer program (known by

2  the Patent-in-Suit as the "second multi-module program") to a user computer for

3  execution of that computer program.  ('936 Patent at 1:6-10, 2:12-14.)  A multi-module

4  operating system includes computer programs consisting of modules of computer code

5  that often contain embedded references (also known as linkage information or associative

6  information) to other modules of computer code.  (*Id.* at 1:11-13.)  Figure 2 below

7  provides a schematic diagram of a coded computer program divided into modules, which

8  in turn reference other modules.  (*Id.* at 2:54-57.)  Each block of Figure 2 constitutes a

9  module of computer code, which list other modules referenced by that module.  The

10  arrows in Figure 2 show the connection between a module and the modules that it

11  references.  (*Id.*)



ORDER- 3

1    Prior to, or at the time of, execution of the computer program by the "user"

2    computer, the embedded references within the modules of the computer program must be

3    linked together (or resolved) by the operating system.  (*Id.* at 1:13-15.)  Prior to the

4    present invention, there were two traditional ways of linking the modules of computer

5    code together—static linking and dynamic linking.  (REC Tutorial (Dkt. # 133-1) at 21.)

6    In static linking, a program called a "linker," operating on the "user" computer, pulls all

7    the various modules together into one large module with fully linked internal references.

8    (*Id.* at 21-24.)  This large module is then placed by the "user" computer on a hard drive.

9    When the "user" computer was ready to run the large module (the fully-linked

10   application), the "user" computer would load the entire module into Random Access

11   Memory ("RAM") and operate the instructions from there.[2]  (*Id.* at 25.)

12       In dynamic linking, all of the modules of a multi-module program are stored on

13   the hard drive, but unlike static linking, they are not linked together.  (*Id.* at 28.)  At the

14   time the "user" computer executes the multi-module program, the operating system

15   utilizes a linker program to read through the code modules to identify the other modules

16   that are referenced by each module.  (*Id.* at 29.)  For instance, in Figure 2 above, the

17   linker program would begin at the "Main Code Module," which references Modules A,

18   B, and C.  (*Id.* at 29-35.)  For each referenced module, the linker program constructs in

19   RAM a "dynamic link table" including the identification of Modules A, B, and C as

20   modules referenced by the "Main Code Module," as well as the RAM address where each

21   _____

22   [2] RAM is a faster memory type than memory that makes up the hard drive of a computer.
(REC Tutorial at 5.)

ORDER- 4

1    Module can be found.  (*Id.* at 31.)  The information of references between modules (i.e.

2    linkage information) found in the dynamic link table constitutes what the Patent-in-Suit

3    refers to as an "association."  ('936 Patent at 2:14-22.)  The dynamic linker may continue

4    to construct an association for the modules referenced by Modules A, B, and C, and so on

5    for the remaining modules of the multi-module program.  (REC Tutorial at 31.)

6           In practice, the dynamic link table can be used by another program that utilizes

7    some of the same modules as the first program, such that a specific module is only loaded

8    into RAM once, saving time and memory space.  (Microsoft Tutorial (Dkt. # 132-1) at

9    28.)  This was an improvement over the static linking process.  (*Id.* at 28.)  Still, the

10   dynamic linking process was slow in searching for the location of each module

11   referenced by the Main Code Module or other modules containing embedded references.

12   (REC Tutorial at 38.)  The present invention purports to improve the efficiency of

13   running a multi-module program when compared to dynamic linking and static linking.

14   (*Id.* at 42.)

15          The present invention adds a "code server" to the described multi-module

16   operating system environment.  ('936 Patent at 2:12-14.)  The code server includes a

17   "module information table" containing information that links or associates discrete

18   modules of a multi-module program.  (*Id.* at 2:14-22; 3:49-50.)  Thus, a code server

19   functions to provide linking information for modules of a multi-module program to a

20   "user" computer that desires to run the program.  (*Id.* at 28-32.)  By storing module

21   linking information in a code server, the need to search through a multi-module program

22

1  and then find the location of referenced modules in memory is greatly reduced.  Figure 3

2  below depicts the interface between the code server and the "user" computer.



FIG. 3

In this matter, REC has asserted claim 1 and 8 of the ''936 Patent.  Claim 1 is an

independent claim and claim 8 is a dependent claim.  Claim 1, a method claim, is

provided below:

1.  A method of providing information to a **first program that is executing on a computer** for forming an association for a **second multi-module program** which includes an embedded reference to a discrete module, said method comprising the steps of:

(a) receiving in a **code server** from said first program, at a point prior to execution-time of said multi-module program being associated, a request associated with said discrete module;

(b) **searching a module information table for module information in response to said request associated with said discrete module**;

(c) in response to finding said module information in said module information table, reading said module information;

(d) providing said module information in a response to said first program; and

(e) **forming an association of said multi-module program by said first program**.

('936 Patent at Claim 1 (bolding added).)  The bolded portions of the quoted claim language represent the claim terms in dispute.

### III.   ANALYSIS

In *Markman v. Westview Instruments, Inc.*, the Supreme Court placed sole responsibility for construing patent claims on the court.  517 U.S. 370, 372 (1996).  The Federal Circuit later established that the court construes claims purely as a matter of law.  *Cybor Corp. v. FAS Tech., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (applying de novo review to all claim construction issues, even "allegedly fact-based questions").  Executing the *Markman* mandate requires a court to interpret claims after giving the appropriate level of consideration to various sources of evidence.

Intrinsic evidence, which includes the patent and its prosecution history, is the primary source from which to derive a claim's meaning.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).  A patent is composed of three parts:  (1) a "written description," which consists of an often lengthy exposition of the background of

1   the invention, at least one embodiment of the invention, and other written material that

2   assists in understanding how to practice the invention; (2) (in most cases) a set of

3   drawings that illustrates portions of the written description; and (3) the claims, which

4   delimit the scope of the invention.  *General Foods Corp. v. Studiengesellschaft Kohle*

5   *mbH*, 972 F.2d 1272, 1274 (Fed. Cir. 1992).  Together, these three components make up

6   the patent's "specification."[3]  *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374,

7   1384 (Fed. Cir. 1999); 35 U.S.C. § 112.

8       The prosecution history exists independently of the patent.  It consists of the

9   inventor's application to the United States Patent and Trademark Office ("PTO") and all

10   correspondence between the PTO and the inventor documenting the invention's progress

11   from patent application to issued patent.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d

12   1576, 1582 (Fed. Cir. 1996).

13       In its review of intrinsic evidence, the court begins with the language of both the

14   asserted claim and other claims in the patent.  *Phillips*, 415 F.3d at 1314; *Biagro Western*

15   *Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1302 (Fed. Cir. 2005) ("It is elementary

16   that claim construction begins with, and remains focused on, the language of the

17   claims.").  The court's task is to determine the "ordinary and customary meaning" of the

18   terms of a claim through the eyes of a person of ordinary skill in the art on the filing date

19   of the patent.  *Phillips*, 415 F.3d at 1313 (quoting *Vitronics*, 90 F.3d at 1582).

20   _____

21       [3] Although 35 U.S.C. § 112 includes the claims as part of the specification, many courts and practitioners use the term "specification" to refer to all portions of a patent except the claims.

22   In most instances, the context will reveal what portion of the specification is at issue.

1   Sometimes, the ordinary meaning is "readily apparent even to lay judges," in which case

2   claim construction "involves little more than the application of the widely accepted

3   meaning of commonly understood words." *Id.* at 1314.

4          The court must read claim language, however, in light of the remainder of the

5   specification.  *Id.* at 1316 ("[T]he specification necessarily informs the proper

6   construction of the claims.").  In cases where the ordinary meaning of a claim term seems

7   apparent from its use in the claim, the court must consult the specification either to

8   confirm that meaning or to establish that the inventor intended a different meaning.

9   *Superguide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).  If the

10   ordinary meaning is not apparent from its use in the claim, the court looks to the

11   specification to provide meaning.  *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175

12   F.3d 985, 990 (Fed. Cir. 1999).  The specification acts as a "concordance" for claim

13   terms, and is thus the best source beyond claim language for understanding claim terms.

14   *Phillips*, 415 F.3d at 1315.  The inventor is free to use the specification to define claim

15   terms as she wishes, and the court must defer to an inventor's definition, even if it is

16   merely implicit in the specification.  *Id.* at 1316 ("[T]he inventor's lexicography

17   governs."), 1320–21 (noting that a court cannot ignore implicit definitions).  The court

18   should "rely heavily" on the specification in interpreting claim terms.  *Id.* at 1317.

19          When the court relies on the specification, however, it must walk a tightrope

20   between properly construing the claims in light of the written description and the

21   "cardinal sin" of improperly importing limitations from the written description into the

22   claims.  *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337,

1   1340 (Fed. Cir. 2001); *Phillips*, 415 F.3d at 1323 (citing *Comark Commc'ns, Inc. v.*

2   *Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed. Cir. 1998)).  A patentee often provides

3   examples or "embodiments" of his or her invention in the written description, but courts

4   may not limit the invention to an embodiment absent clear evidence that a patentee

5   "intends for the claims and the embodiments . . . to be strictly coextensive." *Phillips*, 415

6   F.3d at 1323.

7   　　　　Although a patent's prosecution history is also intrinsic evidence, it is "less useful

8   for claim construction purposes," because it usually "lacks the clarity of the

9   specification." *Id.* at 1317.  The prosecution history is useful, however, in determining if

10  an inventor has disavowed certain interpretations of his or her claim language.  *Id.*

11  　　　　Finally, the court can consider extrinsic evidence, "including expert and inventor

12  testimony, dictionaries, and learned treatises." *Id.* (citing *Markman v. Westview*

13  *Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)).  Extrinsic evidence is usually "less

14  reliable than the patent and its prosecution history" as a source for claim interpretation.

15  *Id.* at 1318.  The court thus need not admit extrinsic evidence, but may do so in its

16  discretion if intrinsic evidence does not disclose the meaning of a claim term.  *Id.* at

17  1319; *Vitronics*, 90 F.3d at 1583 ("[W]here the public record unambiguously describes

18  the scope of the patented invention, reliance on any extrinsic evidence is improper.").

19  With this general framework in mind, the court turns to the claim terms in dispute.

20

21

22

**A.     "First program that is executing on a computer"/ "second multi-module program"**

The terms-in-dispute are found in asserted claim 1 of the '936 Patent.  The parties offer the following proposed constructions:

**REC's Proposed Constructions:  "First program that is executing on a computer"** means "a set of computer instructions running on a computer that enables the computer to perform a specific operation or operations" **and "second multi-module program"** means "a set of computer instructions that comprises two or more modules and enables the computer to perform a specific operation or operations."  (Updated Joint Claim Chart (Dkt. # 134-1) at 1.[4])

**Defendants' Proposed Constructions:**  The terms-in-dispute should be given their ordinary meaning.[5]  (Updated Claim Chart at 1.)

The central dispute between the parties is whether the word "program" must be defined.  Although the parties agree that the specification is silent with respect the word "program," they disagree as to how that silence is to be interpreted.  Defendants contend that the word has a well-understood meaning in the computer science field and therefore needs no construction.  (Microsoft Opening Br. at 9-10.)  REC responds that without a

---

[4] On January 11, 2012, after completion of *Markman* briefing, the parties filed a Joint Claim Chart containing updated proposed constructions for each disputed term.  (Dkt. # 134-1.) The court will rely on the proposed constructions contained in the updated Joint Claim Chart in this *Markman* order.

[5] During the *Markman* hearing, for the first time, Microsoft provided the court with the following proposed construction of the word "program":  "The complete set of computer instructions to perform a process."  (Transcript (Dkt. # 145) at 98-99.)

1  construction, Microsoft is free to enlarge the scope of the word "program," through

2  argument to the finder of fact, to encompass entire software products, which according to

3  REC constitute multiple "programs."  (REC Opening Br. at 17.)  REC seeks to define the

4  word "program" through dictionary definitions.  (*Id.*)

5      The court will construe the terms-in-dispute.  Here, the parties have a genuine

6  dispute as to the scope of the word "program."  *O2 Micro Intern. Ltd. v. Beyond*

7  *Innovation Technology Co., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("In deciding that

8  'only if' needs no construction because the term has a 'well-understood definition,' the

9  district court failed to resolve the parties' dispute because the parties disputed not the

10  *meaning* of the words themselves, but the *scope* that should be encompassed by this

11  claim language.") (internal quotations omitted).

12      Additionally, although the word "program" may readily be understood by one of

13  skill in the art, to a lay person finder-of-fact, the word has numerous meanings, e.g., a

14  computer program versus a baseball game program versus a television program.  Thus,

15  construction of the term is appropriate.  *Id.* ("A determination that a claim term 'needs no

16  construction' or has the 'plain and ordinary meaning' may be inadequate when a term has

17  more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does

18  not resolve the parties' dispute.").

19      As is the case here, where the specification (and other intrinsic evidence) is silent

20  as to the word "program," the court may refer to dictionary definitions for guidance.  *L.B.*

21  *Plastics, Inc. v. Amerimax Home Prods.*, 499 F.3d 1303, 1308 (Fed. Cir. 2007) ("Since

22  the intrinsic record provides no further guidance to the meaning of the terms 'weld,'

1   'fuse' or 'ultrasonic or heat welding,' the district court properly turned to extrinsic

2   evidence in this case and consulted dictionaries."  REC has provided the court with

3   numerous technical dictionary definitions for the word "program."  (REC Opening Br. at

4   17 (citing *The Illustrated Dictionary of Microcomputers* (3rd ed. 1990) ("A set of

5   instructions . . . directing the computer in performing a desired operation,"); *Wiley Electr.*

6   *and Electr. Engineering Dictionary* (2004) ("A set of instructions which . . . cause a

7   computer to perform specific operations.").)  The court finds that REC's proposed

8   constructions for the terms-in-dispute closely align with the technical dictionary

9   definitions apt to define the word "program" in the context of the Patent-in-Suit.

10          Accordingly, the court adopts REC's proposed constructions.  **"First program**

11  **that is executing on a computer"** means "a set of computer instructions running on a

12  computer that enables the computer to perform a specific operation or operations" and

13  **"second multi-module program" means** "a set of computer instructions that comprises

14  two or more modules and enables the computer to perform a specific operation or

15  operations.

16  **B.      "code server"**

17          The term "code server" is found in asserted claim 1 of the '936 Patent and also in

18  numerous other claims of the Patent-in-Suit.  As stated, the "code server" constitutes the

19  crux of the patented invention.  The parties propose the following constructions for the

20  term-in-dispute:

21          **REC's Proposed Construction:**  "computer software that (i) is an identifiable set

22  of computer instructions other than the first program, and (ii) is capable of maintaining,

1  and providing to the first program upon request, module information for one or more

2  modules of a multi-module program."  (Updated Joint Claim Chart at 1-2.)

3      **Defendants' Proposed Construction:**  "a disjoined task (separate process from

4  the first program) that maintains and provides to the first program upon request module

5  information for one or more modules of a multi-module program."  (Updated Claim

6  Chart at 1.)

7      While the parties agree that the function of the code server is to maintain and

8  provide to the first program module information for one or more modules of a multi-

9  module program, the parties' competing constructions raise two distinct disputes:  (1)

10  whether the code server is computer software that is capable of performing certain tasks

11  or process (REC's position) or is itself a "task" or "process" (Defendants' position), and

12  (2) the language to use in describing the distinction between the code server and the first

13  program.  These issues are disused in turn below.

14      First, the court agrees with REC that the claim language and the specification

15  make clear that the code server is a thing, albeit an abstract thing, capable of performing a

16  task or tasks.  The code server is found in the claim language of claim 1, a method claim:

17  "receiving in a code server from said first program, . . . a request associated with said

18  discrete module."  The plain claim language indicates that the code server is a thing

19  which receives a request from the first program as opposed to a task or process, as

20  Defendants contend.  Consistent with the claim language, the specification describes the

21  code server as a thing, made up of various parts, which can perform a function.  For

22  example, the specification states:  "The code server, which provides information to users

ORDER- 14

1  of the data processing system, includes an information storage table containing linkage

2  information needed to form an association between discrete modules of code . . . ." ('936

3  Patent at 2:13-16.)

4         Defendants direct the court to the following passage of the specification, which

5  Defendants assert supports their construction:

>      The code server is embodied in a transaction oriented protocol for
>      communication between the user and the code server which allows the
>      users and the code server to be on two remote computer systems or to be
>      configured as separate disjoined tasks in a multi-processing system on a
>      single computer.

9  (Microsoft Opening Br. at 10 (citing '936 Patent at 3:21-26).)  As REC correctly points

10 out, this passage from the specification describes a possible configuration of the code

11 server and the user computer(s), but does not describe the code server itself.  Thus,

12 Defendants' reliance on this passage is misplaced.  The court concludes that the code

13 server is more aptly described as a thing as opposed to a process or task.

14        With respect to the second dispute, although the parties agree that the code server

15 is distinct from the first program, REC and Defendants disagree as to the language for

16 describing this distinction.  REC seeks to describe the distinction as "an identifiable set of

17 instructions other than the first program," whereas Defendants describe the distinction as

18 a "separate process from the first program."  (REC Opening Br. at 19; Microsoft Opening

19 Br. at 11.)  Essentially, the dispute turns on whether the word "other" or the word

20 "separate" should be used to describe the distinction.

21        REC contends that if the court accepts Defendants' proposed construction,

22 Defendants will be free to argue that for the code server to be separate from the first

1   program either (1) the code server and first program may not interact, or (2) the code

2   server and first program must not reside on the same memory hardware.  (REC Opening

3   Br. at 20.)  REC contends that both of these arguments, as an extension of Defendants'

4   proposed construction, are incorrect.   (*Id.*)  The court agrees with REC on both accounts.

5   The claim language and the specification clearly indicate that the first program and the

6   code server will interact.  ('936 Patent at Claim 1 ("receiving in a code server from said

7   first program").)  Additionally, the code server and the first program may exist on the

8   same hardware.  ('936 Patent at 3:21-26 ("the user and the code server [may] be on two

9   remote computer systems or . . . on a single computer.").)  This is not to say that the code

10  server and the first program are the same.  Indeed, they are certainly distinct from one

11  another.  As Defendants explain, Figures 1 and 3 of the specification explicitly depict the

12  code server as distinct from the requesting (or user) program.  (Microsoft Opening Br. at

13  11.)

14        Returning to the parties' dispute, the court is concerned that Defendants' choice of

15  "separate" affords Defendants the opportunity to improperly argue, as it does in its brief,

16  that the code server and first program are completely isolated from one another.  (*See id.*

17  at 11.)  On the other hand, REC's use of the word "other" fails to capture the requisite

18  distinction required by the specification of the '936 Patent.  Accordingly, the court

19  believes that the word "different" properly captures the relationship between the code

20  server and the first program.

21        As a final matter, Defendants argue that REC's inclusion of the phrase "an

22  identifiable set of computer instructions" in its definition of code server lacks supporting

1    intrinsic evidence.  The court has fully examined the specification of the '936 Patent and

2    finds that the specification fails to provide a clear definition of code server, instead

3    consistently defining the term by its functionality and purpose.  (*See generally* '936

4    Patent.)  In such a situation, the court will adopt a "construction that stays true to the

5    claim language and most naturally aligns with the patent's description of the invention."

6    *Phillips*, 415 F.3d at 1316.  Here, the court finds that the code server is a piece of

7    software—a computer program.  The specification makes clear that the code server may

8    be a separate piece of hardware, be built into the network, or be a part of the operating

9    system itself.  ('936 Patent at 3:17-20.)  Logically, functions performed through hardware

10   will be the result of the execution of a computer program.  Moreover, the claim language

11   and specification recite interaction between the code server and the first program, which

12   seemingly could only occur if the code server was a computer program itself.  Having

13   already defined the word "program" as a set of computer instructions, the court finds

14   REC's inclusion of the phrase "an identifiable set of computer instructions" accurate and

15   helpful to the finder of fact.  Indeed, the word "identifiable" assists the finder of fact in

16   distinguishing the code server from the first program.

17        In conclusion, based on the claim language and the specification, the court gives

18   the term "code server" the following construction:  "an identifiable set of computer

19   instructions, different than the first program, which maintains and provides to the first

20   program upon request module information for one or more modules of a multi-module

21   program."

22

**C.    "searching a module information table for module information in response to said request associated with said discrete module."**

The term-in-dispute is found in asserted claim 1 of the '936.  The parties propose the following constructions:

**REC's Proposed Construction:**  "in response to a request that includes an identification of the discrete module, the code server searches for module information in the module information table pertaining to the discrete module."  (Updated Joint Claim Chart at 2.)

**Defendants' Proposed Construction:**  "in response to a request that includes an identification of the discrete module, the code server searches for module information in the module information table pertaining to the discrete module and any referenced modules."[6]  (*Id.* at 2.)

Here, the parties' dispute is clear:  whether the term-in-dispute requires (1) search for module information pertaining to the discrete module (REC's position) or (2) search for module information pertaining to the discrete module *and to any modules referenced by the discrete module* (Defendants' position).  (*Id.* at 2 (emphasis added).)  The parties' proposed constructions mirror one another except that Defendants' construction requires

_____

[6] In it opening brief, Defendants proposed the following construction for the term-in-dispute:  "in response to a request that includes an identification of the discrete module, the code server searches for <u>any and all</u> module information in the module information table pertaining to the discrete module and any referenced modules."  (Microsoft Opening Br. at 14; REC Opening Br. at 7.)  REC disputed the "any and all" limitation contained in Defendants' construction, and in its responsive claim construction brief, Defendants removed the "any and all" language from its original proposal.  (Microsoft Resp. Br. (Dkt. # 124) at 13.)  Therefore, the court no longer must resolve this dispute.

1   a search not only for information pertaining to the discrete module, but additionally, for

2   any modules referenced by the discrete module.  Both parties cite to intrinsic evidence in

3   support of their constructions.  (*See* REC Opening Br. at 7-10; Microsoft Opening Br. at

4   14-16.)  The court discusses the intrinsic evidence below, which it finds dispositive of the

5   proper construction, and for the reasons set forth below, the court agrees with REC's

6   proposed construction.

7          First, REC argues that an ordinary reading of the claim language supports its

8   proposed construction.  (REC Opening Br. at 8.)  Essentially, REC argues that "searching

9   a module information table for module information" per a request as to a discrete module

10  ordinarily means that a search of that discrete module occurs, and not a search of modules

11  referenced by the discrete module.  (*Id.*)  REC provides an example of a library which

12  maintains an information table on each of its books.  According to REC's example, if the

13  someone was to search the library's information table as to the book *Lincoln the Lawyer*,

14  it would ordinarily mean that a search was conducted for information on *Lincoln the*

15  *Lawyer*, but not necessarily all books referenced by *Lincoln the Lawyer*.  (*Id.*)

16  Defendants respond that claim construction should not be performed by isolating the

17  claim language from the specification, and when the term-in-dispute is read in light of the

18  intrinsic evidence, its construction that requires the search to look for "any referenced

19  module" is supported.  (Microsoft Reply Br. at 13-14.)  Here, the court is persuaded that

20  an ordinary reading of the claim language favors REC's construction, but agrees with

21  Defendants that the term-in-dispute must be read in light of the remaining intrinsic

22  evidence.

ORDER- 19

1    The court turns to the specification.  Both parties principally cite to the same

2    passage:  "a request by a user for a particular code module will immediately locate all of

3    the associate information pertaining to that module in the code module information

4    table."  ('936 Patent at 4:31-35; REC Opening Br. at 10; Microsoft Reply Br. at 14.)

5    Unsurprisingly, REC emphasizes the phrase of the passage "pertaining to that module,"

6    to argue that the search is limited to the requested module.  In response, Defendants

7    emphasize the phrase "locate all of the associate information" to argue that all of the

8    information associated with the requested module must be searched including all modules

9    referenced by the requested module.  The court finds that the natural reading of this

10   passage of the specification supports REC's construction.  Here, as REC asserts, the

11   phrase "pertaining to *that* module" strongly indicates a search of the information table

12   limited to the code module subject to the request.  Although Defendants' interpretation of

13   the passage is plausible, the court finds it forced.  It is apparent that had the patentee

14   intended the search to include the requested module as well as all of the referenced

15   modules, it would have stated so in the passage.  Instead the patentee chose to describe

16   his invention by limiting the search to "that module."

17       Indeed, throughout the specification, the patentee makes clear when it is

18   referencing module information (also described as "associative information" or "linkage

19   information") for a specific module as opposed to module information for any referenced

20   modules.  For instance, in describing Figure 2 (shown above), the specification states,

21   "The main code module includes linkage information linking it with code module A,

22   code module B, and code module C."  ('936 Patent at 4:13-15.)  Examining Figure 2

ORDER- 20

1    demonstrates that the main code module links to modules A, B, and C.  (*Id.* at Figure 2.)

2    Thus, in accord with REC's proposed construction, the specification described the

3    linkage information as only the information included in the specific module.  For

4    Defendants' proposed construction to be correct, the specification would have described

5    the linkage information as not only modules A, B, and C, but also the modules referenced

6    by modules A, B, and C.  By contrast, when the patentee sought to describe the module

7    and its referenced modules, it did so expressly.  For example, when referring to *all* of the

8    linkage information of Figure 2, the specification states, "Collectively the linkage

9    information referred to above forms an *associative set* for the main code module and code

10   modules A through E.  (*Id.* at 4:25-27.)  In sum, in describing its invention, the patentee

11   differentiated between module information relating to a specific module and module

12   information related to collective or referenced modules.  As such, the disputed passage,

13   which recites a discrete module, supports REC's position that the search is for only the

14   information related to that discrete module.

15          Citing to the Abstract of the specification, Defendants also argue that because the

16   stated purpose of the invention is to "relieve the first program [user] of the task of

17   searching for modules and extracting linkage information," it would be pointless to

18   search for only a portion of the associative information stored in the module information

19   table. (Microsoft Opening Br. at 14-15.)  The court acknowledges that in certain

20   instances a search for information pertaining to the discrete module and the referenced

21   modules may be advantageous.  But, as explained above, the claim language and the

22   specification do not place such a limitation on the term-in-dispute.  Here, the court

1  declines to read a limitation into the claims based on an advantageous configuration of

2  the patented invention not required by the intrinsic evidence.

3      In conclusion, having found that the claim language and the specification require

4  only that the search be performed for information related to discrete, requested module,

5  the court gives the term-in-dispute the following construction:  "in response to a request

6  that includes an identification of the discrete module, the code server searches for module

7  information in the module information table pertaining to the discrete module."[7]

8  **D.    "forming an association of said multi-module program by said first program"**

9      The disputed term is found in asserted claim 1 of the ''936 Patent.  The parties

10  propose the following constructions:

11     **REC's Proposed Construction:**  "The first program forms a data structure with

12  information concerning how one or more modules of the second multi-module program

13  link to one or more other modules."  (Updated Joint Claim Chart at 2.)

14     **Defendants' Proposed Construction:**  "The first program creates a table

15  containing all dynamic links for every module that the second multi-module program will

16  ever need."  (*Id.* at 2.)

17

18  ───────────────

19     [7] With little explanation, Defendants also argue that the specification describes an
iterative search process, whereby the search process does not stop until all references pertaining
to the requested module are located.  (Microsoft Reply at 14.)  Defendants cite to Figure 3 of the
20  Patent-in-Suit as well as passages from the specification describing Figure 3.  (*Id.*)  The court has
examined Defendants' citations and finds Defendant's reliance on the citations misplaced in the
21  context of the term-in-dispute, which relates to the search performed by the code server.
Defendants' citations relate to an iterative process performed by the user computer, and not to an
22  iterative process performed by the code server, and therefore are not relevant to the term-in-
dispute.

1   REC aptly describes the parties' disputes as two minor disputes and one primary

2   dispute.  (REC Opening Br. at 11.)  The first minor dispute is whether the phrase

3   "forming an association" found in the term-in-dispute should be described as "how

4   modules link to other modules" (REC's position) or "dynamic links" (Defendants'

5   position).  The second minor dispute is whether the phrase "forms a data structure"

6   (REC's position) or "creates a table" (Defendants' position) properly defines the

7   "forming an association" set forth in the claim language.  Finally, the major dispute is

8   over whether "an association" may include linkage information for only part of a

9   complete program (REC's position) or whether "an association" must include linkage

10   information "for every module that the second multi-module program will ever need

11   (Defendants' position).  The court discusses the three disputes in turn.

12          i.       "how modules link to other modules" vs. "dynamic links"

13   REC supports its proposed language by a passage in the specification, which

14   states, "modules contain linkage information which point[s] to additional modules and

15   which collectively forms an association."  (REC Opening Br. at 11 (citing '936 Patent at

16   3:14-16).)  In response, Defendants assert that during prosecution of the parent patent to

17   the '936 Patent, the patentee described the association in terms of "dynamic links."

18   (Microsoft Opening Br. at 16-18.)  Defendants provide various excerpts from the

19   prosecution history, but principally cite to the following portion, which is provided

20   without ellipses for context:

21          **Dynamic links which are used in conjunction with forming an**
        **<u>association</u>**, as that term is defined by the present invention and used in

22   applicant's specification and claims, generally refer to linkages used in

operating systems such as OS/2 from IBM or Windows 3.x from Microsoft, for the loading and execution of code modules. In principle, under such systems code modules are simply read into memory by the operating system just prior to the multi-module program's execution in order to extract module information so as to determine the multi-module program's interrelationships between the code modules, and few modifications, if any, are made to the code modules themselves. The code modules, unlike the process of linking, do not address the other code modules directly, **but instead address internal tables built within the operating system itself, i.e., tables of dynamic links**. These dynamic link tables act under control of the operating system as an intermediary addressing the other code modules. For example, using such dynamic link tables provide the added advantage of not requiring that all the code modules be loaded into memory while determining the interconnections between them. Another advantage of using dynamic link tables, over simply linking and loading as described by Tennant, is that the code modules may be moved without requiring the referencing modules to be changed, because references are effected via the dynamic link tables which, in turn, represent and address the other code modules. When a referenced code module is moved, the dynamic link tables are simply updated to reflect its new location. **As used in the specification and claims, applicant refers to the creation by the operating system of the dynamic link tables necessary for the execution of a multi-mode program as "association".** [sic] In contrast, the process of linking and loading code pieces, as described by Tennant, is not what applicant's invention refers to as association and Tennant's process is directed to a system that is much more limited in nature.

(Microsoft Opening Br. at 18 (citing Prosecution History (Dkt. # 112-11) at 6-7 (bolding and underlining in original).) The patentee made these statements to the United States Patent and Trademark Office ("PTO") in an effort to overcome a rejection of two pieces of prior art, "Tennant" and "Terada." (*See* Prosecution History at 3.)

Without citing the relevant law, Defendants apparently rely on this excerpt to invoke the doctrine of prosecution disclaimer and argue that REC disavowed a construction of "forming an association" to include anything other than "dynamic links." (*Id.* at 17 ("REC distinguished its technique of 'forming an association,' which REC told

1   the PTO in no uncertain terms involved 'dynamic linking,' over the prior art Tennant in

2   order to gain allowance.  No backsies.").)  "[S]tatements made during prosecution

3   may . . . affect the scope of the invention."  *Rexnord Corp. v. Laitram Corp.*, 274 F.3d

4   1336, 1343 (Fed. Cir. 2001).  Specifically, "a patentee may limit the meaning of a claim

5   term by making a clear and unmistakable disavowal of scope during prosecution."

6   *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006).  A

7   patentee could do so, for example, by clearly characterizing the invention in a way to try

8   to overcome rejections based on prior art.  *See, e.g.*, *Microsoft Corp. v. Multi-Tech Sys.,*

9   *Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004).

10          Having carefully reviewed the portions of the prosecution history cited by

11   Defendants, as well as the entire prosecution record at the PTO placed before the court,

12   the court can find no statements by the patentee clearly disavowing an association of

13   everything but "dynamic links."[8]  Instead, the patentee distinguished the prior art

14   (Tennant and Terada) by arguing that its invention "assists in the association of a multi-

15   module program," utilized in dynamic linking, whereas the prior art merely taught linking

16   and loading the modules themselves without the patented code server and information

17   table to assist.  (Prosecution History at 8.)  Said a different way, the patentee argued that

18   the prior art related to traditional static linking, whereas the novelty of the invention was

19

20          [8] As used throughout the specification and in the prosecution history, the term "dynamic
21   link" is a term of art describing the references between discrete modules in a dynamic linking
     operating system.  Limiting the term-in-dispute by a term of art may have the undesirable effect
22   of narrowing the scope of the claim to accused products which reference themselves by that term
     of art.

1   the code server, including a module information table, to assist in creating an association

2   for a multi-module program in a dynamic linking environment.  (*Id.* at 3 and 4 ("The

3   executable program thus created by Tennant is <u>a single file</u> that is static in nature,

4   meaning that the one executable linked file contains all the code pieces . . . .")

5   (underlining in original).)  Thus, the patentee distinguished its invention through the

6   novelty of assisting in the formation of an "association."  In making this distinction, the

7   patentee described the association as comprised of "dynamic links."  This is not a

8   situation for prosecution disclaimer.  *Computer Docking Station Corp. v. Dell, Inc.*, 519

9   F.3d 1366, 1374-75 (Fed. Cir. 2008) ("Prosecution disclaimer does not apply to an

10  ambiguous disavowal.  Prosecution disclaimer does not apply, for example, if the

11  applicant simply describes features of the prior art and does not distinguish the claimed

12  invention based on those features.").

13      Although the court finds that the patentee did not disavow all associations except

14  for dynamic links, "the statements [in the prosecution history] may offer interpretative

15  assistance to the court in construing a particular claim."  *Prima Tek II, L.L.C. v. Polypap,*

16  *S.A.R.L.*, 318 F.3d 1143, 1149 (Fed. Cir. 2003).  Here, the patentee's repeated references

17  to the term "dynamic links" when describing the claimed "association" makes clear that

18  the patentee expected the association to be made up of dynamic links.  Accordingly, the

19  court will incorporate the term "dynamic links" into the definition of the term-in-dispute

20  as an example of what may constitute an "association."

21

22

1      **ii.     "forms a data structure" vs. "creates a table"**

2          In the second minor dispute, the parties disagree on the proper description for the

3 phrase "forming an association," found in the term-in-dispute.  REC finds support for its

4 construction in dictionary definitions.  (REC Opening Br. at 11-12.)  REC further argues

5 that its proposed language—"forms a data structure"—will be less likely to confuse a

6 jury than Defendants' proposed language.  (*Id.*)  Specifically, REC asserts that the word

7 "table," found in Defendants' proposed language, imputes rows and columns to the

8 structure of the "association," which REC contends has no support in the record.  (*Id.*)

9 Defendants disagree that the word "table" is more likely to confuse a jury than the term

10 "data structure," and further argue that the specification supports a construction including

11 the word "table."  (Microsoft Resp. Br. at 18.)  Here, the court agrees with REC.

12          As an initial matter, Defendants reliance on the specification is wholly misplaced.

13 Defendants direct the court to various portions of the specification which reference the

14 word "table."  (*Id.* at 17-18.)  Each and every one of Defendants' citations refer to the

15 code module information table, found in the claim language.  (*Id.*)  The code module

16 information table is certainly a table, but it is also certainly distinct from the

17 "association," that is formed.  Indeed, it is the code module information table which

18 assists in creating the "association" by the "first program" or user.  (*See* '936 Patent at

19 Claim 1 ("(c) in response to finding said module information in said *module information*

20 *table*, reading said module information; (d) providing said module information in a

21 response to said first program; and (e) *forming an association of said multi-module by*

22 *said first program*.") (emphases added).)  Therefore, that the specification describes the

code module information table as a "table" is irrelevant to the correct structure of the "association."

It appears that once again the specification is of little guidance in determining the structure of the association.  As stated, in such a situation, the court will adopt a "construction that stays true to the claim language and most naturally aligns with the patent's description of the invention."  *Phillips*, 415 F.3d at 1316.  Here, the claim language leaves little doubt that the "association" is formed by the first program (the user program).  Having already defined the word "program" as a set of computer instructions, it is logical that any creation of a computer program will be some sort of "data structure," as set forth by REC.  Moreover, such a description of "association" aligns with the overall nature of the Patent-in-Suit.

      **iii**      **"one or more modules of the program" vs. "every module that the program will ever need"**

The major issue between the parties turns on whether an "association," as recited in the claim language, must include linkage information "for every module that the second multi-module program will ever need," or may include linkage information for "just parts of" the second multi-module program.  REC argues that the claim language and specification support a construction of "association" including linkage information for *only parts of* a complete second multi-module program (as well as linkage information for the entire second multi-module program).  (REC Opening Br. at 12.) Defendants respond that the prosecution history dictates a limiting construction of "association" requiring an "association" to include linkage information for every module

ORDER- 28

1   the second multi-module program will ever need.  (Microsoft Opening Br. at 18-19.)  The

2   court addresses the parties' arguments in turn.

3       The court agrees with REC that the claim language supports a construction of

4   "association" including linkage information for only parts of a complete second multi-

5   module program.  Claim 1 of the '936 Patent recites a method "for forming an

6   association" comprised of five distinct steps, (a) through (e).  (*See* '936 Patent at Claim

7   1.)  The method begins with step (a) and "receiving . . . a request associated with said

8   discrete module."  The claim language of step (a) describes one discrete module, as

9   opposed to a request for every module the second multi-module program will ever need.

10  Next, step (b) is "searching . . . for module information in response to said requested

11  associated with said discrete module."  The court has already construed this term (*supra* §

12  III.C) to require only a search for linkage information related to the discrete module (and

13  not also a search for information of modules referenced by the discrete module).  In

14  response to finding module information through the search of step (b), step (c) reads the

15  module information.  Again, step (c) relates to only reading information related to the

16  discrete module.  Then, step (d) provides the module information to the first program.

17  Logically, the module information provided by step (d) is only that of the discrete

18  module.  Finally, in step (e) the first program forms an association of the second multi-

19  module program.  Because each of the aforementioned steps (a) through (d) pertain only

20  to a discrete module, the only conclusion is that the formed "association" also pertains

21  only to the discrete module.  Thus, the claim language supports a construction of

22

1  "association" including linkage information for only parts of a complete second multi-

2  module program, indeed, only a discrete module of the second multi-module program.

3          Consistent with the claim language, the specification expressly contemplates an

4  "association" comprised of less than a complete second multi-module program.  REC

5  aptly directs the court to the following two passages from the specification (REC

6  Opening Br. at 12.):

7          "The code server . . . includes an information storage table containing
           linkage information needed to form an association between discrete
8          modules of code forming at *least parts* of a coded program."

9  ('936 Patent at 2:12-18 (emphasis added).)  And, also:

10         "[T]hese modules contain linkage information which point to additional
           modules and which collectively forms an *association linking together at*
11         *least parts of a complete program*."

12  (*Id.* at 3:14-16 (emphasis added).)  These passages make clear that the "association" need

13  not constitute the entire second multi-module program, but can be something less, such as

14  "parts of a complete program."  Thus, the court finds that the specification supports

15  REC's position.[9]

16

17  _____

18  [9] The parties partake in a dispute as to the iterative nature of the invention.  Defendants
    argue that the iterative nature of the invention indicates that the "association" created constitutes
    all the linkage information the second multi-module program will ever need.  Principally, the
19  parties argue over Figure 3 of the '936 Patent.  The court has examined Figure 3 and the
    portions of the specification explaining Figure 3 and finds them ambiguous as the iterative nature
    of the invention.  On one hand, the flow chart in Figure 3 may be interpreted such that the "user"
20  program continues a search until it knows all of the linkage information of the second multi-
    module program.  On the other hand, as the claim language and specification indicate that the
21  "user" program may request discrete modules or only part of the complete second multi-module
    program, the Figure may be interpreted to mean that the "user" program continues a search until
22  it knows all of the linkage information that it seeks via its current search, which could be less

ORDER- 30

1    Nevertheless, Defendants assert, again without citing the relevant law, that the

2    prosecution history dictates a limited scope for the term-in-dispute requiring an

3    "association" to include linkage information "for every module that the second multi-

4    module program will ever need." (Microsoft Opening Br. at 18-19.)  Here, again,

5    Defendants seek to limit the scope of a term based on the prosecution history, thereby

6    invoking the doctrine of prosecution disclaimer set forth above.  Defendants again

7    principally rely on the same passage from the prosecution history (*supra* § III.D.i), and

8    particularly on the following sentence:  "As used in the specification and claims,

9    applicant refers to the creation by the operating system of the dynamic link tables

10   *necessary for the execution of a multi-mode program as 'association'*." (Microsoft

11   Opening Br. at 18-19.)  Keying on the word "necessary," Defendants assert that the

12   "association" must include "all dynamic links necessary for the execution of the

13   program." (*Id.*)

14       The court has examined Defendants' cited sentence within the context of the

15   prosecution history and does not find that it amounts to a clear disavowal of claim scope.

16   In Defendants cited prosecution reference, the patentee was generally arguing to

17   overcome a rejection of the Tennant and Terada prior art.  (*See generally* Prosecution

18   History.)  The patentee made two general arguments to overcome that prior art.  First (as

19   explained, *supra* § III.D.i), the patentee argued that the prior art did not teach any tool,

20   such as a code server and code module information table, for assisting in the formation of

21

22   than a completed second multi-module program.  Thus, because of this ambiguity, the court finds
     that Figure 3 has little relevance to its construction of the term "association."

1   an association.  (*See* Prosecution History at 8 ("Tennant only teaches the linking and

2   loading of programs . . . distinguished from applicant's claimed system which assists in

3   the formation of an association.").)  Second, the patentee argued that in the prior art the

4   operating system itself read code modules directly in order to extract the module

5   information for creating the association.  (Prosecution History at 6 (in the prior art, "code

6   modules are simply read into memory by the operating system . . . in order to extract

7   module information so as to determine the multi-module program's interrelationships

8   between the code modules").)  But, in the patented invention, the code modules are not

9   accessed directly to determine linkage information, but instead through internal tables

10  which contain information about the relationships between the code modules.  (*Id.* at 6-7

11  ("The code modules, unlike the process of linking do not address other code modules

12  directly, but instead address internal tables built within the operating system itself, i.e.,

13  tables of dynamic links.").)  Importantly, at no point did the patentee distinguish the prior

14  art on the basis that its invention provides for an association containing *all* the linkage

15  information the second program will ever need, whereas the prior art only taught creating

16  an association for less than all of the linkage information the second program will ever

17  need.  In fact, at no point in the prosecution history did the patentee even distinguish the

18  prior art based on the amount of module information that constitutes an "association."

19          Here, Defendants only argue that the patentee's description of "association" as

20  "necessary for the execution of a multi-mode program" limited the scope of the term to

21  "every module that the second multi-module program will ever need."  The court

22  disagrees.  This statement by the patentee did not disclaim an association that includes

1   *some* linkage information necessary for execution of the multi-module program.

2   Certainly, an association including only some of the linkage information for an entire

3   multi-module program will still be necessary for execution of the multi-module program.

4   At most this statement is ambiguous as to the amount of module information constituting

5   an association.  *Sandisk Corp. v. Memorex Prods.*, 415 F.3d 1278, 1287 (Fed. Cir 2005

6   ("There is no 'clear and unmistakable' disclaimer if a prosecution argument is subject to

7   more than on reasonable interpretation."); *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355

8   F.3d 1327, 1332 (Fed. Cir. 2004) (holding that statements in the prosecution history

9   subject to multiple interpretations do not constitute a clear and unmistakable disavowal).

10   And, as explained, the statement in question was not made to distinguish the invention

11   from the prior art.  Thus, the court cannot find that REC clearly disavowed the scope of

12   the term "association" as Defendants suggest.  *See Computer Docking Station.*, 519 F.3d

13   at 1374-75.

14        In accord with the foregoing, the court construes the term "forming an association

15   of said multi-module program by said first program" to mean "the first program forms a

16   data structure with information (such as dynamic links) concerning how one or more

17   modules of a second multi-module program link to one or more other modules."

18        IT IS SO ORDERED.

19        Dated this 1st day of May, 2012.

20

21

                                                        _____

22                                                        JAMES L. ROBART
                                                       United States District Judge