UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| REC SOFTWARE USA, INC., | CASE NO. C11-0554JLR |
| Plaintiff, | ORDER DENYING SUMMARY JUDGMENT |
| v. | |
| BAMBOO SOLUTIONS CORPORATION, et al., | |
| Defendants. | |

## I.     INTRODUCTION

This matter comes before the court on Defendant Microsoft Corporation's ("Microsoft") motion for summary judgment of non-infringement and invalidity due to indefiniteness and inadequate written description.  (Mot. (Dkt. # 188).)  Having considered Microsoft's motion, Plaintiff REC Software USA, Inc.'s ("REC") response (Resp. (Dkt. # 208)), Microsoft's reply (Reply (Dkt. # 218)), REC's sur-reply (Sur-reply Dkt. # 229), Microsoft's supplemental brief (Microsoft Supp. (Dkt. # 272)), REC's

1  response to Microsoft's supplemental brief (REC Supp. Resp. (Dkt. # 292)), all

2  attachments and declarations in support and opposition to the motion, the balance of the

3  record, and the governing law, and having heard oral argument of the parties on August

4  23, 2012, the court DENIES Microsoft's motion (Dkt. # 188).

5  **II.     FACTUAL BACKGROUND**

6       Stephen F.B. Pickett is the sole inventor of U.S. Patent No. 5,854,936 (the "Patent-

7  in-Suit"), which was assigned to REC.  (*See* U.S. Patent No. 5,854,936 (the '936 Patent).)

8  REC contends that Microsoft operating systems that support or utilize the .NET

9  Framework—namely, Windows 2000, Windows Server 2003, Windows Server 2008,

10  Windows Vista, Windows XP, and Windows 7—infringe of claims 1 and 8 of the Patent-

11  in-Suit.  (Levine Rpt. (Dkt. # 209-1) at 5.)

12  **A.     The Patent-in-Suit**

13       The asserted claims of the Patent-in-Suit disclose methods related to the behind-

14  the-scenes work done by a computer's operating system to prepare complex computer

15  programs (referred to by the Patent-in-Suit as "multi-module programs") for execution by

16  a "user" computer.  ('936 Patent at 1:6-10.)  The central component of the invention is a

17  "code server," which operates in a multi-module computer operating system to efficiently

18  maintain and prepare multi-module programs for execution.  (*Id.* at 1:6-10, 2:12-14.)  In

19  particular, the code server includes a code module information table which stores

20  information about how modules reference each other, i.e., link together.  (*Id.* at 3:49-51.)

21       Figure 2 (below) from the specification of the Patent-in-Suit provides a schematic

22  diagram of a multi-module computer program illustrating references of one module to

other modules.  (*Id.* at 2:54-57.)  The arrows in Figure 2 demonstrate which modules are

referenced by a specific module.  (*Id.*)



The "module information table" of the code server contains information of how

the discrete modules of the multi-module program reference (or link to) one another.  (*Id.*

at 2:14-22; 3:49-50.)  This linkage information is necessary to execute a multi-module

program, and thus, the code server functions to provide linkage information for modules

of a multi-module program to a "user" computer that desires to run the program.  (*Id.* at

28-32.)  By storing module linking information in a code server, the need to search

individual modules and extract linkage information is no longer necessary and execution

of a multi-module program is made more efficient.  (Levine Rpt. at 12.)

In this matter, REC has asserted claims 1 and 8 of the '936 Patent.  Claim 1 is an independent claim and claim 8 is dependent on claim 1.  Claim 1, a method claim, is provided below:

1.   A method of providing information to a first program that is executing on a computer for forming an association for a second multi-module program which includes an embedded reference to a discrete module, said method comprising the steps of:

(a) receiving in a code server from said first program, at a point prior to execution-time of said multi-module program being associated, a request associated with said discrete module;

(b) searching a module information table for module information in response to said request associated with said discrete module;

(c) in response to finding said module information in said module information table, reading said module information;

(d) providing said module information in a response to said first program; and

(e) forming an association of said multi-module program by said first program.

('936 Patent at Claim 1.)

**B.    The Accused .NET Framework[1]**

The accused .NET Framework is a software development platform that runs on Microsoft Windows operating systems.  (Mot. at 6; Levine Rpt. at 20.)  .NET Framework is used to create and execute .NET programs.  .NET programs are not parts of the accused .NET Framework itself, but are instead programs developed by third parties

---

[1]Many of the statements in this section rely on the contents of the portion of Microsoft's motion for summary judgment titled "Background of the Patent and Microsoft's Accused Software," which in turn cites to portions of REC's expert report of Dr. John Levine.  (Mot. at 5-8; Levine Rpt. 20-37.)  Thus, the statements do not appear to be contested.

ORDER- 4

1   within the .NET Framework and which execute and use certain functionalities of the

2   .NET Framework.  (Mot. at 6, FN. 6.)

3       The building block of a .NET program is called an "assembly."  (*Id.* at 7; Levine

4   Rpt. at 21.)  An assembly consists of a file that contains computer instructions and a

5   collection of "metadata" that enables the code and enables the assembly's code to be used

6   by other assemblies.  (Mot. at 7.)  A portion of an assembly's metadata known as the

7   "manifest" includes dependency (linkage) information, which identifies other code or

8   assemblies that are necessary to the operation of the assembly.  (*Id.*)

9       Assemblies that are intended to be shared by multiple .NET programs may be

10  stored on a user's computer in a set of folders known as the Global Assembly Cache

11  ("GAC").  (*Id.*)  Each assembly on the GAC is stored inside a subfolder containing

12  identifying information about the assembly.  (*Id.*)

13      A .NET program executes when a .NET assembly that ends in ".exe" (an

14  "executable assembly") is double-clicked by the user.  (*Id.*)  A .NET program is not self-

15  contained and is run by and uses the services of the .NET Common Language Runtime

16  ("CLR"),which prepares the executable .NET program for execution.  (*Id.*)

17      If during execution, the executable .NET program requires code of an assembly,

18  the .NET program informs the CLR of that need.  (*Id.*)  The CLR first checks to see if it

19  has already loaded the assembly.  (*Id.*)  If it has not, it checks the GAC to see if the

20  requested assembly is stored there.  (*Id.*)  If the required assembly is not in the GAC, the

21  CLR looks for the dependent assembly in other folders on the user's computer.  (*Id.* at 7-

22  8.)  If and when the required assembly is located, the CLR "maps" the assembly into

ORDER- 5

1   virtual memory so that the portions of the dependent assembly may be accessed as

2   needed.  (*Id.* at 8.)  "Mapping" is a term of art referring to an operating system technique

3   that allows a file on a disk to be accessed as though it were physically loaded into random

4   access memory ("RAM") and allows an operating system to conserve RAM by only

5   loading portions of a file that are actually needed rather than the entire file.  (*Id.*)  After

6   mapping, the CLR returns control to the executable assembly.  (*Id.*)

7                          **III.    ANALYSIS**

8           Microsoft moves for summary judgment on three grounds:  (1) that REC has no

9   evidence that Microsoft infringes the "code server" limitation; (2) that REC has no

10  evidence of direct infringement; and (3) the asserted claims are invalid due to

11  indefiniteness and lack of adequate written description.  (Mot. at 5.)

12  **A.      Standard for Summary Judgment**

13          Federal Rule of Civil Procedure 56 permits a court to grant summary judgment

14  where (1) the moving party demonstrates the absence of a genuine issue of material fact

15  and (2) entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S.

16  317, 322 (1986).  "Material," for purposes of Rule 56, means that the fact, under

17  governing substantive law, could affect the outcome of the case.  *Anderson v. Liberty*

18  *Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir.

19  1997).  For a dispute to be "genuine," a reasonable jury must be able to return a verdict

20  for the nonmoving party.  *Anderson*, 477 U.S. at 248.

21          The initial burden of establishing the absence of a genuine issue of material fact

22  falls on the moving party.  *Celotex*, 477 U.S. at 323.  The movant can carry his burden in

1    two ways:  (1) by presenting evidence that negates an essential element of the nonmoving

2    party's case; or (2) by demonstrating that the nonmoving party "failed to make a

3    sufficient showing on an essential element of her case with respect to which she has the

4    burden of proof."  *Id.* at 322-23.  "Disputes over irrelevant or unnecessary facts will not

5    preclude a grant of summary judgment."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

6    *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

7           Where the moving party meets that burden, the burden then shifts to the non-

8    moving party to designate specific facts demonstrating the existence of genuine issues for

9    trial.  *Celotex*, 477 U.S. at 324.  This burden is not a light one.  The non-moving party

10   must show more than the mere existence of a scintilla of evidence.  *Anderson*, 477 U.S. at

11   252.  The non-moving party must do more than show there is some "metaphysical doubt"

12   as to the material facts at issue.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

13   475 U.S. 574, 586 (1986).  In fact, once the moving party makes this initial showing, the

14   non-moving party "may not rest upon the mere allegations or denials of the [nonmoving]

15   party's pleading," but must provide affidavits or other sources of evidence that "set forth

16   specific facts showing that there is a genuine issue for trial" from which a jury could

17   reasonably render a verdict in the non-moving party's favor.  Fed. R. Civ. P. 56(e);

18   *Anderson*, 477 U.S. at 252.  In determining whether a jury could reasonably render a

19   verdict in the non-moving party's favor, all justifiable inferences are to be drawn in the

20   non-moving party's favor.  *Anderson*, 477 U.S. at 252.

21

22

1    **B.     "Code Server" Limitation**

2          "The infringement analysis is a two step inquiry.  'First, the court determines the

3    scope and meaning of the patent claims asserted, and then the properly construed claims

4    are compared to the allegedly infringing device.'"  *Cordis Corp. v. Boston Scientific*

5    *Corp.*, 658 F.3d 1347, 1354 (Fed. Cir. 2011) (citing *Cybor Corp. v. FAS Techs., Inc.*, 138

6    F.3d 1448, 1454 (Fed. Cir. 1998) (en banc)).  Infringement may be proven by literal

7    infringement, or under the doctrine of equivalents. Gen. Elec. Co. v. Int'l Trade Com'n,

8    670 F.3d 1206, 1214 (Fed. Cir. 2012).

9          In its *Markman* order,[2] the court construed the term "first program that is

10   executing on a computer" as "a set of computer instructions running on a computer that

11   enables the computer to perform a specific operation or operations."  (*Markman* Order

12   (Dkt. # 159) at 13.)  Additionally, the court construed "code server" as "an identifiable

13   set of computer instructions, different than the first program, which maintains and

14   provides to the first program upon request module information for one or more modules

15   of a multi-module program."  (*Id.* at 17.)  In its analysis of "code server," the court

16   further observed:  "This is not to say that the code server and the first program are the

17   same.  Indeed, they are certainly distinct from one another."  (*Id.*)

18         Microsoft argues that summary judgment of non-infringement regarding the "code

19   server" limitation is appropriate because REC and its expert, Dr. Levine, have admitted

20   that the alleged "code server" in Microsoft's accused software is not different than the

21   ───────────────────

22         [2]*See Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

1   "first program," as the claims and the court's construction require.  (Mot. at 8.)

2   Specifically, Microsoft contends that Dr. Levine alleges that Microsoft's .NET

3   Framework infringes the Patent-in-Suit when the .NET Common Language Runtime

4   ("CLR") locates and prepares to read from a disk a single code file.[3]  (*Id.* at 10.)  Thus,

5   Microsoft asserts that REC's theory of infringement requires that both the "first program"

6   and the "code server" reside within single program—the .NET CLR—and are thus not

7   different from one another such that Microsoft's accused .NET Framework does not

8   infringe.

9       REC responds that the accused .NET Framework does in fact satisfy the "code

10  server" limitation.  (Resp. at 4-5.)  REC asserts that in the accused .NET Framework, it

11  has identified an "identifiable set of computer instructions" (Assembly::Create, Global

12  Assembly Cache, and BindToObject) as the "code server," and an "identifiable set of

13  computer instructions" (AppDomain) as the "first program."  (*Id.*)  REC asserts that the

14  identified "code server" performs the operation of "maintaining and providing to the first

15  program upon request module information for one or more modules of the multi-module

16  program," as required by the court's construction.  (*Id.*)  Accordingly, REC asserts that it

17  has proof that the accused product satisfies each requirement in the claim construction for

18  "code server."  (*Id.*)

19      Additionally, REC disputes Microsoft's contention that simply because the Dr.

20  Levine locates the "code server" and the "first program" within a single program—the

21  _____

22  [3]Microsoft contends that Dr. Levine's expert report is REC's only evidence for
infringement.

ORDER- 9

.NET CLR—Microsoft cannot infringe.  REC argues that a "program," defined by the court as "a set of instructions that enables the computer to perform a specific operation or operations" (*Markman* Order at 13), certainly permits a "program" to be comprised of multiple programs.  In other words, according to REC, the "code server" and the "first program" may be different sets of instructions that enable the computer to perform a specific operation(s), yet still both reside in the same larger program—the .NET CLR. Moreover, REC asserts that Microsoft's own expert agrees that each of the separate sets of instructions identified by Dr. Levine within the CLR would meet the court's construction of "program."  (Resp. at 6-7.)

The court agrees with REC and finds that a material issue of fact exists as to whether, under REC's theory of infringement, the "code server" and the "first program" are different, as required by the court's construction.  Although the court's construction requires the "code server" and the "first program" to be different programs, nothing in the in the court's construction prohibits a theory of infringement where the "code server" and "first program" both reside within a larger "program," as the court has defined the word.

Here, Dr. Levine has identified an "identifiable set of computer instructions" that REC asserts constitutes the "code server" and a different "identifiable set of computer instructions" that REC asserts constitutes the "first program."  With respect to the "code server," Dr. Levine points to three portions of the .NET Framework source code or Windows operating system that REC asserts constitutes the "code server":  (1) the Global Assembly Cache; (2) the "BindtoObject" computer instructions, which are responsible for searching the Global Assembly Cache for an assembly; and (3) the

1   "Create::Assembly" computer instructions, which are responsible for the operation of

2   creating the assembly sub-element of a domain assembly with a mapped copy of the

3   assembly manifest.  (Levine Rpt. at 50.)  Regarding the "first program" limitation, Dr.

4   Levine identifies a separate "identifiable set of computer instructions" that REC contends

5   meets this limitation—the "AppDomain" program found in the .NET Framework.

6   (Levine Rpt. at 95.)  Dr. Levine asserts that the "identifiable set of computer instructions"

7   that constitute the "code server" and the "first program" have no overlap in terms of

8   source code or computer function and constitute an identifiable set by the nature in which

9   they are grouped, as found in Microsoft's source code.  These assertions, with all

10  justifiable inferences drawn in REC's favor, create a genuine issue of material fact such

11  that summary judgment is not appropriate.  Whether the identified computer instructions

12  are in fact different is a question for the jury, after hearing all of the evidence.

13  **C.      Direct Infringement**

14          To succeed on a theory of contributory or induced infringement, REC must show

15  direct infringement of the '936 Patent.  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d

16  1301, 1317 (Fed. Cir. 2009); *see also Glenayre Elecs., Inc. v. Jackson*, 443 F.3d 851, 858

17  (Fed. Cir. 2006).  Because the claims asserted by REC are method claims, Microsoft's

18  sale of the .NET Framework as part of the accused Windows operating systems, without

19  more, does not infringe the ''936 Patent.  *Lucent*, 580 F.3d at 1317.  Direct infringement

20  occurs only when someone performs the claimed method.  *Id.*  To prove direct

21  infringement, REC need only show that at least one person performed the methods

22

1  claimed in the Patent-in-Suit.  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 850 (Fed.

2  Cir. 2010).

3      Microsoft contends that REC has no evidence of direct infringement and therefore

4  REC's claims of infringement fail as a matter of law.[4]  (Mot. at 12-14.)  In response, REC

5  asserts that it has ample evidence of direct infringement.  (Resp. at 11-12.)  REC cites to

6  (1) a survey conducted by REC expert, Dr. William Wecker, that found approximately

7  88% of software developers have developed .NET programs; (2) a 2004 "Forrester"

8  survey of North American enterprises that found that 56% of respondents named .NET as

9  their primary development platform; and (3) Microsoft's identification of approximately

10 3000 different .NET programs (or applications).  (*Id.*)  REC further contends, through its

11 expert, Dr. Levine, that running a .NET application necessarily results in direct

12 infringement because REC's theory of infringement is fundamental to any .NET

13 program.  (*Id.* at 11 (citing Levine Rpt. at 110-11 ("In this instance, it is not possible for a

14 user to run a .NET [program] without searching the 'code server' for 'module

15 information' in order to 'form an association' in a manner required by the claims.").)

16 Additionally, REC contends that Microsoft has provided instructions to third parties to

17 use .NET programs, and provides as an example Microsoft's Visual Studio program.

18 (Levine Rpt. at 111.)

19

20

_____

21   [4]In this matter, REC has not accused Microsoft of direct infringement, but of induced and

22 contributory infringement.  (Complaint (Dkt. # 1) ¶ 15.)

1    Contrary to Microsoft's position that REC's circumstantial evidence is "not well

2    taken," circumstantial evidence may be used to show direct infringement.  In *Toshiba*

3    *Corp. v. Imation Corp.*, 681 F.3d 1358 (Fed. Cir. 2012), through circumstantial evidence,

4    the Federal Circuit found sufficient evidence to create a genuine issue of material fact and

5    stated the following:

6         Direct infringement can be proven by circumstantial evidence.
          Circumstantial evidence must show that at least one person directly
7         infringed an asserted claim during the relevant time period.

8    *Id.* at 1364 (citations and quotations omitted).  Indeed, "[a]lthough the evidence of

9    infringement is circumstantial, that does not make it any less credible or persuasive."

10   *Alco Standard Corp. v. Tenn. Valley Auth.*, 808 F.2d 1490, 1503 (Fed. Cir. 1986)).

11   Nevertheless, Microsoft asserts that REC's theory of infringement encompasses

12   only "one possible flavor of the .NET Framework, namely the specific use of the .NET

13   Framework in which a .NET program makes use of a dependent .NET assembly stored in

14   the GAC."  (Mot. at 12.)  Thus, according to Microsoft, to establish infringement, REC

15   must prove that users of the .NET Framework (within the Windows operating system)

16   actually use the software in the precise way REC alleges infringes.  (*Id.*)  REC does not

17   appear to disagree with Microsoft's assessment of the law or REC's theory of

18   infringement, but counters that any execution of a .NET program necessarily implicates

19   what Microsoft characterizes as "one possible flavor of the .NET Framework."  (Resp. at

20   12.)

21   The court agrees with REC and finds that, based on a Dr. Levine's opinion and

22   REC's circumstantial evidence, a reasonable jury could find at least one instance of direct

1  infringement.  Here, Dr. Levine asserts that any execution of a .NET program necessarily

2  results in direct infringement of the patent.  (Levine Rpt. at 111.)  Additionally, REC's

3  provides evidence that the .NET Framework is a popular development platform and that

4  thousands of .NET programs have been created through the platform.  (Resp. at 11-12.)

5  To that end, Dr. Levine further opines that .NET developers necessarily that run .NET

6  programs during development and that Microsoft encourages the use of at least one .NET

7  program (Visual Studio).  (Levine Rpt. at 105, 111.)  Based on this evidence, a

8  reasonable jury could infer from the circumstantial evidence that at least one person has

9  run a .NET program and credit Dr. Levine's testimony to conclude that direct

10  infringement has occurred.  *See Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317,

11  1326 (Fed. Cir. 2009) (reversing district court finding of no direct infringement where

12  expert testimony, accepted as true for summary judgment purposes, established that

13  accused blenders will necessarily infringe under certain circumstances and factual

14  evidence supported the occurrence of those circumstances).  Thus, summary judgment is

15  not appropriate.

16  **D.**     **Indefiniteness Regarding the Word "Program" Found in the '936 Patent**

17          The requirement of claim definiteness is set forth in the second paragraph of 35

18  U.S.C. § 112, which requires claims "particularly pointing out and distinctly claiming the

19  subject matter which the applicant regards as his invention."  35 U.S.C. § 112.  "[O]nly

20  claims not amenable to construction or insolubly ambiguous are indefinite."  *Star*

21  *Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1371 (Fed. Cir. 2008).

22

1   Microsoft does not argue that the claim term "program" as found in the language

2   Patent-in-Suit is indefinite because it cannot be construed, but instead asserts, that the

3   word "program," as construed by the court, lacks boundaries in the manner in which REC

4   applies the word to the accused .NET Framework.  (Mot. at 16.)  In and of itself, a

5   reduction of the meaning of a claim term into words is not dispositive of whether the term

6   is definite.  *Star Scientific*, 537 F.3d at 1371-72; *Halliburton Energy Services, Inc. v. M-I*

7   *LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008) ("Even if a claim term's definition can be

8   reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot

9   translate the definition into meaningfully precise claim scope.").  And, if reasonable

10   efforts at claim construction result in a definition that does not provide sufficient

11   particularity and clarity to inform skilled artisans of the bounds of the claim, the claim is

12   insolubly ambiguous and invalid for indefiniteness.  *Star Scientific*, 537 F.3d at 1371-72.

13   Indefiniteness is a purely legal issue reviewed without deference by the Federal Circuit.

14   *Id.* at 1373.  Under the patent statutes, a patent enjoys a presumption of validity, which

15   can be overcome only through facts supported by clear and convincing evidence.  *See* 35

16   U.S.C. § 282; *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1563 (Fed. Cir. 1997).

17   To properly analyze Microsoft's argument, the court must start with its *Markman*

18   constructions.  As stated, the court construed "first program that is executing on a

19   computer" as "a set of computer instructions running on a computer that enables the

20   computer to perform a specific operation or operations."  (*Markman* Order at 13.)  The

21   court also construed "second multi-module program" to mean "a set of computer

22   instructions that comprises two or more modules and enables the computer to perform a

ORDER- 15

specific operation or operations." (*Id.*)  Inherent in these constructions is the definition of the word "program" as "a set of computer instructions that enables the computer to perform a specific operation or operations."  This definition of the word "program" was utilized in the construction of the term "code server," construed as "an identifiable set of computer instructions, different than the first program, which maintains and provides to the first program upon request module information for one or more modules of a multi-module program." (*Id.* at 17.)

Seizing on this definition of the word "program," Microsoft argues that the definition provides "no "articulable" principal as to how to determine how many instructions constitute a "set," or from how few or how many disparate sources instructions may be aggregated and still considered a "set," or what separates one set from another set.  (Mot. at 16.)  As a result, Microsoft contends that REC may arbitrarily identify various parts of the .NET CLR or of a .NET program to suit its infringement theory.  Thus, Microsoft asserts that the term is invalid due to indefiniteness.  (Mot. at 16.)  REC responds that one of ordinary skill in the art at the time of the invention would understand the word "set" and the phrase "that enables a computer to perform a specific operation or operations."  (Resp. at 15-16.)  REC further asserts that its identification of claim limitations are in no way arbitrary, because the identified sets of instructions is a named set of instructions as grouped by Microsoft's own software developers.  (*Id.* at 18.)  Therefore, REC asserts there is no ambiguity in the court's construction and the term is not indefinite.  (Resp. at 15-16.)

1    The court agrees with REC and concludes that the word "program," as defined by

2  the court does not render the claims of the Patent-in-Suit indefinite.  As an initial matter,

3  the word "program" was not construed in isolation, but instead in the context of the

4  disputed claim terms "first program that is executing on a computer" and "second multi-

5  module program."  Consequently, the definition of the "program," does not appear by

6  itself, but instead is confined by the surrounding claim language and the surrounding

7  language of the constructions for the terms "first program," "second multi-module

8  program," and "code server."  For instance, the term "second multi-module program" is

9  not defined as an arbitrary set of computer instructions, but instead as a "program" that

10  must contain at least two modules and an embedded reference to another module.

11  Similarly, the term "code server" requires the set of computer instructions to be different

12  than the first program and that the instructions perform the function of maintaining and

13  providing module information.  Such surrounding words provide clarity to one of skill in

14  the art.

15    Moreover, and critical to the examination of indefiniteness, the evidence before

16  the court of how one of ordinary skill in the art would understand the court's definition of

17  "program" supports a finding of definiteness.  REC has placed before the court testimony

18  from its expert Dr. Levine—who the court assumes for purposes of this motion is a

19  person of ordinary skill in the art—that he does not find the court's definition of

20

21

22

ORDER- 17

1   "program" insolubly ambiguous.  (Resp. at 15-16 (referencing 2nd Supp. Levine Rpt.[5]

2   (Dkt. # 209-4) at 4-7.)  Although Dr. Levine's testimony is arguably biased towards REC,

3   because Microsoft has failed to submit any evidence to the contrary, it remains as the

4   only probative evidence as to how one of ordinary skill in the art would understand the

5   court's construction.  Accordingly, Microsoft has failed to demonstrate by clear and

6   convincing evidence that court's definition of the word "program" renders the claims of

7   the patent insolubly ambiguous to one of ordinary skill in the art.  Thus, the court denies

8   Microsoft's motion for indefiniteness with respect to the court's construction of the

9   "program" found in the claims of the Patent-in-Suit.

10  **E.      Indefiniteness Regarding the Term "forming an association . . ." Found in the
           '936 Patent**

11

12         In a similar argument, Microsoft asserts that REC's application of the court's

13  construction of the term "forming an association of said multi-module program by said

14  first program**"** renders the limitation invalid as indefinite "because it does not distinctly

15  claim the nature of the 'association' that is 'formed.'"  (Mot. at 22.)  The court construed

16  the limitation "forming an association of said multi-module program by said first

17  program**"** as "the first program forms a data structure with information (such as dynamic

18  links) concerning how one or more modules of a second multi-module program link to

19  one or more other modules."  (*Markman* Order at 33.)  Microsoft contends that REC has

20

21         [5]The Microsoft and REC dispute whether the information contained in the second
    supplemental report of Dr. Levine constitutes new expert opinions that are untimely (and should
    be disregarded) under the court's scheduling order.  (Reply at 4-6; *see generally* Sur-reply.)  The
22  court addresses this disagreement below and concludes that it will consider the contents of the
    second supplemental report of Dr. Levine.  (*Infra* § III.E)

1    exploited the language "information . . . concerning," of the court's construction, by

2    identifying portions of the .NET CLR that do not form a data structure with information

3    that actually describes how one or more modules link to one another.  (Mot. at 22.)

4    According to Microsoft, REC's theory of infringement meets the "forming an association

5    . . ." limitation through a pointer into the beginning of a block of "heterogeneous data

6    inside which such various pieces of linkage information might somewhere be located."

7    (*Id.*)

8         REC responds that Microsoft mischaracterizes its infringement theory and that it

9    does not attempt to exploit the court's construction of the "forming an association . . ."

10   limitation by asserting infringement based on a data structure that does not contain

11   information that actually describes how one or more modules link to other modules.

12   (Resp. at 22.)  Instead, REC contends that to meet the "forming an association . . ."

13   limitation it identifies a data structure that includes precise linkage information, including

14   for each discrete module, the names and version numbers of the modules that are

15   referenced by that discrete module.  (*Id.* (citing Levine Rpt. 95-100; 2nd Supp. Levine

16   Rpt. at 48-54).)

17        As an initial matter, Microsoft asserts that REC has changed its theory of

18   infringement regarding the "forming an association . . ." limitation to include citations to

19   "brand-new source code" through the second supplemental report of Dr. Levine that was

20   served after Microsoft filed the present motion for summary judgment.  (Reply at 4-6,

21   11.)  Microsoft asserts that this new theory should be disregarded by the court.  (*Id.* at 4-

22   6.)  REC responds that the second supplemental report only responds to new invalidity

ORDER- 19

1    arguments and opinions that were provided in an amended invalidity report by

2    Microsoft's expert, Dr. Kogan, and in Microsoft's present summary judgment motion

3    filed one week after the amended report of Dr. Kogan.  (Sur-reply at 3.)  From the

4    parties' briefing, the court cannot fully trace the history of the numerous expert reports

5    that appear to have been filed in this case, and it appears that both Microsoft and REC

6    have served untimely expert reports on the issues of validity.  (*See* Reply at 4-6 ("Yet it

7    was not until after . . ., Dr. Levine was deposed . . . and expert discovery closed, that REC

8    proceeded to serve its 'supplemental' reports . . ."); Sur-reply at 3 ("Dr. Levine's Second

9    Supplemental Report responds to new invalidity arguments and opinions that were

10   provided after Dr. Levine submitted his validity report in the Amended Kogan Invalidity

11   Report (which was untimely served 47 days after Microsoft's initial invalidity report)"

12   (emphases removed).)

13          Nevertheless, having examined Dr. Levine's second supplemental report, the court

14   concludes that the report addresses new invalidity positions raised by Microsoft and its

15   expert.  (*See* 2nd Supp. Levine Rpt. at 4 ("In this Report, I respond to several new

16   invalidity opinions offered by Dr. Kogan in the Amended Expert Report . . . regarding the

17   invalidity of [the Patent-in-Suit].").)  As a result, the court will consider the information

18   contained in second supplemental report, but will permit Microsoft to re-take the

19   deposition Dr. Levine with the limitations set forth in the conclusion of this order.

20   However, regardless of whether the court considers the information contained in Dr.

21   Levine's second supplemental report, the result is the same—as a matter of law, the court

22

1  cannot say that its construction of the "forming an association . . ." limitation or REC's

2  application thereof, renders the limitation indefinite.

3      Similar to the word "program," the "forming an association" limitation and its

4  construction are confined by the surrounding words.  Here, the court's construction

5  requires that the limitation is only met through infringement by the identification of a

6  data structure in an accused product.  Additionally, the court's construction demands that

7  the data structure include information concerning how modules of the second multi-

8  module program link to one another.  These requirements would guide a person of

9  ordinary skill and provide clarity to the limitation.  Microsoft's argument that REC's

10  theory of infringement merely indentifies a "pointer" to a block of heterogeneous data

11  does not render the limitation indefinite, but instead relates to whether REC can

12  successfully prove infringement.

13      Moreover, Microsoft has failed to demonstrate that one of ordinary skill in the art

14  would find the construction insolubly ambiguous.  In fact, Microsoft has provided the

15  court with no evidence to that effect.  (*See generally* Mot.)  Indeed, the only evidence

16  before the court as to whether one of ordinary skill in the art would find the construction

17  indefinite is the testimony of Dr. Levine who unequivocally states that the court's

18  construction is not ambiguous.  (2nd Supplemental Rpt. at 40-41.)  Thus, the court cannot

19  find clear and convincing evidence that the construction of the "forming an association

20  . . ." limitation is indefinite.  Accordingly, summary judgment is not appropriate.

21

22

1    **F.      Written Description for "forming an association . . ." Limitation**

2           The written description requirement, set forth in the first paragraph of 35 U.S.C. §

3    112, states:  "The specification shall contain a written description of the invention, and of

4    the manner and process of making and using it, in such full, clear, concise, and exact

5    terms as to enable any person skilled in the art . . . to make and use the same."  35 U.S.C.

6    §112.  Courts have construed the "written description" clause of section 112 to mandate

7    that the specification satisfy two closely related requirements.  First, it must describe the

8    manner and process of making and using the invention so as to enable a person of skill in

9    the art to make and use the full scope of the invention without undue experimentation.

10   *See Tyler v. City of Boston, 7 Wall.*, 74 U.S. 327, 330 (1868); *AK Steel Corp. v. Sollac &*

11   *Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003).  Second, it must describe the invention

12   sufficiently to convey to a person of skill in the art that the patentee had possession of the

13   claimed invention at the time of the application, i.e., that the patentee invented what is

14   claimed.  *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1320-21 (Fed. Cir.

15   2003).  These two requirements usually rise and fall together.  *LizardTech, Inc. v. Earth*

16   *Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005).  That is, a recitation of how to

17   make and use the invention across the full breadth of the claim is ordinarily sufficient to

18   demonstrate that the inventor possesses the full scope of the invention, and vice versa.

19   *Id.*

20          It is well-established that the "hallmark of written description is disclosure."

21   *Ariad Pharms., Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010).  The level

22   of detail required to satisfy the written description requirement depends, in large part, on

1   the nature of the claims and the complexity of the technology.  *Id.*  As the Federal Circuit

2   explained in *Ariad*, the written description requirement "does not demand either

3   examples or an actual reduction to practice; a constructive reduction to practice that in a

4   definite way identifies the claimed invention can satisfy the written description

5   requirement."  *Id.* at 1352 (citing *Falko–Gunter Falkner v. Inglis*, 448 F.3d 1357, 1366-

6   67 (Fed. Cir. 2006)).  That said, a "mere wish or plan" to obtain the claimed invention is

7   not sufficient.  *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1348 (Fed.

8   Cir. 2011) (citing *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1566

9   (Fed. Cir. 1997)).  "Compliance with the written description requirement is a question of

10  fact but is amenable to summary judgment in cases where no reasonable fact finder could

11  return a verdict for the nonmoving party."  *PowerOasis, Inc. v. T–Mobile USA, Inc.*, 522

12  F.3d 1299, 1307 (Fed. Cir. 2008).

13          Microsoft asserts that REC's infringement theory for the "forming an association

14  . . ." limitation requires that the 'module information' (which is the information used to

15  form an association) be read directly from the code modules themselves, rather than from

16  the "code server," as taught in the specification of the Patent-in-Suit.  (Mot. at 26.)  As a

17  result, Microsoft argues that REC's expansive reading of the "forming an association . . ."

18  limitation is unsupported by the specification of the Patent-in-Suit, and therefore lacks

19  the requisite written description.  (*Id.* at 25-26.)  REC responds that the specification

20  explains "forming an association" in a manner that aligns with the court's construction of

21  the limitation and that expert testimony confirms that one of ordinary skill would have

22

1  understood that the inventor was in possession of the concept of "forming an association"

2  when the patent application was filed.  (Resp. at 26.)

3      Here, Microsoft has failed to demonstrate that the specification lacks a written

4  description for the "forming an association . . ." limitation.  Instead, Microsoft merely

5  argues that REC's application of the court's construction is beyond the scope of the

6  specification.[6]  This argument relates to the propriety of the court's *Markman*

7  construction and indirectly to whether REC's infringement theory is beyond the scope of

8  that construction.  The court fails to understand how Microsoft's argument supports its

9  contention that the claims are unsupported by the specification in the eyes of a person of

10 ordinary skill in the art.  Moreover, as the issue has not been raised by either party, the

11 court declines to revisit its claim construction of the "forming an association . . ."

12 limitation.

13     Moreover, with respect to the written description analysis, the court concludes that

14 an issue of fact exists as to whether the specification adequately disclosed a written

15 description for the "forming an association . . ." limitation.  Specifically, the specification

16 describes the limitation in question by stating the following:  "linkage information which

17 

18     [6] Microsoft cites a litany of cases presumably to support its contention that the claims
19 lack written description because the patent holder's infringement theory—a based on the court's
   construction—is beyond the scope that is described in the specification.  (Mot. at 27.)  Each of
   these cases, however, analyzes the written description requirement by examining the disclosures
20 of the specification and the claim language, as opposed to examining the disclosures of the
   specification and the court's construction (and the following application of the court's
   construction by the patent holder).  *See, e.g.*, *Gentry Gallery v. Berkline*, 134 F.3d 1473 (Fed.
21 Cir. 1998) (finding claims to a section sofa with recliner controls that did not limit the location of
   the controls lacked written description in the specification which only discussed sofas where the
22 controls were located in a central location).

1  point to additional modules and which collectively forms an association linking together

2  at least parts of a complete program." ('936 Patent at 3:13-16.)  Additionally, the

3  specification recites that the "user then adds this code module information to his internal

4  association table." (*Id.* at 5:18-19.)  Finally, Dr. Levine testified that one of ordinary skill

5  in the art would understand that the inventor was in possession of the concept of

6  "forming an association," as construed by the court.  (2nd Supp. Levine Rpt. at 57 ("In

7  my opinion, the specification of the ''936 patent conveyed to those of ordinary skill in the

8  art that the inventor was in possession of the claimed subject matter, including the

9  limitation 'forming an association,' as of the filing date.").)  Based on this evidence, a

10 reasonable jury could determine that a person of ordinary skill in the art would determine

11 that the written disclosure requirement had been met.  Accordingly, the court denies

12 summary judgment on this issue.

## IV.   CONCLUSION

14      For the foregoing reasons, court DENIES Microsoft's motion for summary

15 judgment (Dkt. # 188).  Microsoft may re-take the deposition of Dr. Levine to address

16 any new opinions set forth in his first supplemental report, served on June 15, 2012, and

17 //

18 //

19 //

20 //

21 //

22 //

ORDER- 25

1    his second supplemental report, served on July 2, 2012.  The deposition shall be limited

2    in length to two hours and the parties shall bear their own costs.

3          Dated this 31st day of August, 2012.

4

5

6                      _____

7                      JAMES L. ROBART
                       United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 26